STATE OF CONNECTICUT *v.* DONALD GALLO
(AC 32502)

Lavine, Espinosa and Flynn, Js.

---

440

Argued January 9—officially released May 15, 2012

*Norman A. Pattis,* for the appellant (defendant).

*Bruce R. Lockwood,* senior assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Mary A. SanAngelo,* senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Donald Gallo, appeals from the judgment of conviction, rendered after a jury trial, of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (1), assault of public safety personnel in violation of § 53a-167c (a) (2) and

interfering with a peace officer in violation of General Statutes § 53a-167a.[1] The defendant claims that the court improperly (1) admitted testimony from one of the responding police officers concerning other domestic dispute complaints to which he had responded during his police career, (2) admitted into evidence a pellet gun as well as testimony about the pellet gun, (3) excluded testimony from a responding police officer concerning the severity of injuries that another officer sustained at the scene of the crime and (4) permitted the state to impeach the defendant by means of a full protective order issued following his arrest. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. For many years prior to the incident underlying this appeal, the defendant, Donna Anastasia and Anastasia's minor son, R,[2] lived together at a residence in Weston. The defendant and Anastasia were not married, but referred to one another as husband and wife. On October 2, 2008, by approximately 11:30 p.m., the defendant had had two alcoholic drinks. He and Anastasia became involved in a loud verbal dispute concerning an outstanding bill. Then, the defendant became upset because R, who was fifteen years of age at the time, left a bathroom in a messy condition. The defendant,

[1] Following the verdict, the court merged the conviction of interfering with a peace officer in violation of § 53a-167a and assault of public safety personnel in violation of § 53a-167c (a) (2) for purposes of sentencing. The court imposed a total effective sentence of five years incarceration, suspended after one year, followed by three years of probation with special conditions. The jury found the defendant not guilty of assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). Additionally, prior to delivering its charge, the court granted the defendant's motion for a judgment of acquittal as to disorderly conduct in violation of General Statutes § 53a-182 (a) (1).

[2] In the spirit of our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the alleged victim, R. See General Statutes § 54-86e.

Anastasia and R argued on the first floor of the residence before Anastasia went upstairs.

Soon thereafter, Anastasia overheard the defendant and R arguing once again. When she looked down a stairway to the first floor, she observed a thrown glass strike a door frame. She descended the stairs, where she found that R was holding his elbow, claiming to have been struck by the glass. The parties continued yelling at one another until the defendant went upstairs. At that time, over R's protests, Anastasia called the police. Shortly thereafter, Officers Matthew Brodacki, Robert Klein and Richard Palmiero of the Weston police department arrived at the residence.

Upon their arrival, the officers spoke with Anastasia and R, learning that the defendant was alone in an upstairs bedroom. The officers entered the residence and repeatedly ordered the defendant to come out of the bedroom. The defendant did not comply, but shouted expletives at the officers. The officers proceeded to approach the defendant's upstairs bedroom, at which time they observed and took possession of a pellet pistol lying on a hallway floor. In an effort forcibly to remove the defendant from the bedroom, the officers entered the bedroom and Brodacki ordered the defendant to show his hands. The defendant did not comply, but hid his right hand behind his body and acted in an aggressive manner. By this time, Brodacki had his police gun drawn, as did Klein. Ignoring repeated police commands, the defendant shouted expletives at the officers and, with his right hand, threw a key ring that held approximately sixteen metal keys in the direction of Brodacki's face, causing him injury. Because of the defendant's noncompliant and aggressive conduct, Brodacki came close to shooting the defendant.

Brodacki and Palmiero attempted physically to restrain the defendant, who continued to disobey police

commands. While the officers tried to handcuff the defendant, he kept his hands in the area of his waistband, as if he were attempting to retrieve an object therefrom. The officers used physical force and, ultimately, removed the defendant from the bedroom and, despite his physical and verbal efforts to resist, from the residence itself.

A jury found the defendant guilty of interfering with a peace officer and two counts of assault of public safety personnel. After sentencing, this appeal followed.

Before turning to the claims raised on appeal, we set forth the standard of review that guides our analysis. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling[s] [on these bases] . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76 (2010).

A defendant is not entitled to appellate relief on the basis of an erroneous evidentiary ruling, however, without demonstrating that the ruling was harmful to him in that it affected the verdict. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that

the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Thomas*, 110 Conn. App. 708, 718–19, 955 A.2d 1222, cert. denied, 289 Conn. 952, 961 A.2d 418 (2008).

I

First, the defendant claims that the court improperly admitted testimony from one of the responding police officers concerning other domestic dispute complaints to which he had responded during his police career. We disagree.

The record reveals the following relevant facts. During the state's direct examination of Brodacki, the prosecutor asked Brodacki to testify as to the number of "domestic cases" he had investigated as a Weston police officer. Defense counsel objected on the ground of relevancy, and the court heard argument outside of the presence of the jury. Defense counsel argued that the inquiry was irrelevant because it was unrelated to the events at issue. The prosecutor replied that the inquiry related to Brodacki's experience in domestic situations generally, and whether "he [had] ever felt the need to draw his gun" was relevant to demonstrate Brodacki's "sensitivity and dealings in these types of situations." The prosecutor argued that the inquiry helped to explain

why Brodacki acted as he did during the events at issue because it tended to show that "this is not an officer who is trigger happy or who gets involved in these types of tussles and [is] looking for . . . issues that are not there, but this was a rare occasion."

The court stated that, with regard to at least one of the offenses with which the defendant was charged, the state had the burden of demonstrating that the police were acting in the performance of their duties.[3] Upon inquiry from the court, defense counsel acknowledged that the defendant did not believe that the police acted in the performance of their duties during the events in question. The court overruled the defendant's objection, reasoning that the inquiry was relevant because the jury would be asked to evaluate Brodacki's conduct and whether, in his interactions with the defendant, Brodacki had acted in the performance of his police duties.

Thereafter, the prosecutor elicited testimony from Brodacki concerning the events that occurred after he arrived at the defendant's residence. He testified concerning the defendant's failure to obey police commands, why he believed his life was in danger in the defendant's residence and the fact that, prior to the present incident, he had never deemed it necessary to remove his gun from its holster during a domestic dispute investigation. Brodacki testified that, during his ten and one-half years as a Weston police officer, he had been involved as an investigating officer in approximately 100 domestic incidents. The prosecutor asked

---

[3] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer, special policeman appointed under section 29-18b, motor vehicle inspector designated under section 14-8 and certified pursuant to section 7-294d or firefighter *in the performance of such peace officer's, special policeman's, motor vehicle inspector's or firefighter's duties.*" (Emphasis added.)

Brodacki, "out of the 100 domestic incidents that you have been involved in, do you remember this incident clearly?" Once again, defense counsel objected to the inquiry on the ground of relevancy. The court overruled the objection, noting that the events at issue occurred in 2008.[4] Then, the following direct examination by the prosecutor of Brodacki occurred:

"Q. Do you remember this one clearly?

"A. Yes.

"Q. And why?

"A. Because I almost shot a human being.

"Q. And have you ever come that close before?

"A. Never.

"Q. Have you ever come that close since?

"A. No.

"Q. And after this incident, how did it make you feel?

"A. I was shaken and disturbed by it.

"Q. And looking back, would you have done anything differently?

"A. No."

In her closing argument, the prosecutor referred to this testimony, reminding the jury that Brodacki had testified that "this [was] the first domestic he's ever investigated that came to this point. [The responding officers] certainly remember it very clearly."

On appeal, the defendant argues that "Brodacki's prior experience with [domestic disputes], his mental state thereafter, and the fact that he had never before come quite so close to shooting another human being

---

[4] The record reflects that Brodacki's direct examination occurred on February 8, 2010.

were clearly immaterial . . . ." The defendant suggests that the testimony served only to make the present incident sound "all the more menacing," to show "just how dangerous the situation was" and to unfairly prejudice the defendant in the eyes of the jury.[5]

Evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. As a preliminary matter, the evidence was relevant for the purpose of evaluating Brodacki's testimony concerning the events at issue. The jury is asked to evaluate the testimony of every witness for the purpose of determining its accuracy and truthfulness. It is beyond question that, as a component of this fact-finding function, the jury must consider whether a witness who relates past events possessed the ability to perceive those events accurately at the time that they occurred and whether he possesses the ability, at the time of trial, to recall those events accurately. Brodacki provided critical testimony in support of the state's case. Here, the prosecutor asked Brodacki whether he remembered this incident clearly and, later, why he remembered the incident clearly. These inquiries elicited testimony that was relevant to the jury's evaluation of Brodacki's testimony concerning the events underlying the charges brought against the defendant, specifically, why the incident was fixed in his memory. By testifying that, in

---

[5] To the extent that the defendant claims that the court should not have permitted the inquiry because it was unduly prejudicial, we decline to address this ground because it was neither raised before nor addressed by the court. See *State* v. *Alvarez*, 216 Conn. 301, 306–307, 579 A.2d 515 (1990) (reviewing court will consider only those evidentiary objections raised before trial court and considered by trial court); *State* v. *Baptiste*, 114 Conn. App. 750, 770, 970 A.2d 816 (2009) (reviewing court declines to review unpreserved claim that evidence was unduly prejudicial), rev'd on other grounds, 302 Conn. 46, 23 A.3d 1233 (2011); *State* v. *Paris*, 63 Conn. App. 284, 291, 775 A.2d 994 (same), cert. denied, 257 Conn. 909, 782 A.2d 135 (2001).

his experience, the defendant had created an unusually dangerous situation for the police, one that left a strong impact on him emotionally, Brodacki provided the jury with an explanation as to why he was able accurately to recall the events at issue. The defendant does not claim that the inquiry was improper because it served to bolster the witness' credibility in any general sense but because the testimony bolstered the witness' other testimony that the incident was unusually dangerous. The testimony was relevant because it set forth the grounds for the witness' recollection of relevant events. "On the *direct examination* a witness may properly be asked to specify the grounds for his recollection; because the circumstances which have contributed to fix or to strengthen it may show how the witness is justified in his confidence of assertion, and the party offering him is entitled to the benefit of this . . . ." (Citation omitted; emphasis in original.) 3 J. Wigmore, Evidence (Chadbourn Rev. 1970) § 730 (1), p. 77.

Additionally, evidence that Brodacki deemed this to be an unusually dangerous domestic abuse situation was relevant to the issue of whether Brodacki had acted within the scope of his police duties. The court properly relied on the fact that one or more crimes with which the defendant stood charged required the jury to determine whether the police had acted in the scope of their duties. Moreover, the defendant expressly contested this factual issue during the trial. By explaining that his conduct in the defendant's residence was in response to what he perceived as an unusually dangerous domestic abuse situation, one unlike any other he had encountered during a lengthy police career, Brodacki explained how, in light of his police experience, he perceived the events and also afforded the jury a brief explanation for why he acted in the manner that he did. This testimony concerning Brodacki's evaluation of relevant events was pertinent to the jury's determination of whether

the police had acted within the scope of their duties. Accordingly, we do not conclude that the admission of the evidence was improper.

## II

Second, the defendant claims that the court improperly admitted into evidence the pellet gun that the police found in the defendant's residence as well as testimony concerning the pellet gun. We disagree.

Prior to trial, the defendant filed a motion in limine in which he asked the court to exclude the pellet gun as well as any evidence related to the pellet gun. The defendant stated that this evidence lacked any probative value and was highly prejudicial. During argument related to the motion, defense counsel stated that, although the gun was found by the police at the defendant's residence, there was no evidence that the defendant handled the gun or that it played any role in the events at issue during the trial. Further, defense counsel highlighted the fact that the state did not charge the defendant with any crime related to his use or possession of the gun. Defense counsel stated that the gun did not belong to the defendant, but that it belonged to R. Defense counsel also stated that he had reason to believe that the gun was not found in the hallway but somewhere else inside the residence.

The prosecutor argued that the gun was probative evidence. She stated that, on the basis of information provided to the police by Anastasia, when the police arrived on the scene in response to the complaint of domestic violence, they were aware that the defendant may be armed and that he had locked himself in a bedroom that contained his possessions. The prosecutor stated that the evidence would demonstrate that, when the police found the gun in a hallway as they approached the locked bedroom, it elevated their level of concern and was one of several factors that, later,

led the police to draw their guns during their encounter with the defendant in the bedroom. The prosecutor argued that the discovery of the gun was highly relevant to understanding the conduct of the police during the incident. It does not appear that the court ruled on the motion in limine immediately following argument.

During his direct examination by the state, R testified that he owned a pellet gun that had been on the dresser in his bedroom on the night that the police came to his residence. During cross-examination, defense counsel elicited testimony from R that the police removed the gun from his bedroom during their investigation. The court sustained the state's objection to this testimony, on the basis of a lack of foundation. Later, Brodacki testified that, at the time he was in the residence and approaching the defendant's bedroom, he was concerned that the defendant might be armed. He testified that after he ascended a staircase in the residence, he observed a gun on a hallway floor and that other officers took possession of the gun to make sure that it did not pose a safety risk. During his direct examination, Klein testified that he and Brodacki proceeded up a flight of stairs in the defendant's residence, at which time they discovered a pellet gun on the floor of a hallway. Like Brodacki, he testified that the police took possession of the gun and took actions to make sure that it did not pose a safety risk.

During Klein's testimony, but outside of the presence of the jury, defense counsel stated that his evidentiary objection with regard to the gun was limited to the admission of the actual gun into evidence. Defense counsel argued that, based on the facts in evidence, there was no dispute that police had discovered a gun and that it was not in any way related to the claimed criminal activity of the defendant. The prosecutor argued that the discovery of the gun was an important factor, among other factors, that helped to explain why

the police acted in the forceful manner that they did when they encountered the defendant in the bedroom. The discovery of the gun tended to prove that the police had reason to believe that the defendant was a dangerous, and possibly armed, suspect and that strong force was necessary to protect the safety of the officers and others. The court, reasoning that the jury would be asked to consider whether the police had acted in the performance of their duties during the incident, overruled the defendant's objection. Thereafter, the court admitted the gun into evidence.

Three of the charges in this case required the jury to evaluate whether, during the events underlying the prosecution, the police were acting under a good faith belief that they were performing their police duties, rather than engaging in a personal frolic. See *State* v. *Reynolds*, 264 Conn. 1, 33–34, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). With regard to the crime of interfering with an officer in violation of § 53a-167a, as charged, the state bore the burden of proving that the officer was acting in the performance of his duties. See footnote 3 of this opinion. With regard to the crimes of assault of public safety personnel in violation of § 53a-167c (a) (1) and (2), as charged, the state bore the burden of proving that the defendant acted "with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties . . . ." General Statutes § 53a-167c (a).

It is undisputed that not all guns look alike. Additionally, there is reason to presume that the average juror might be unfamiliar with the appearance of a pellet gun. Here, the state attempted to demonstrate that the appearance of the particular pellet gun found in the residence had some effect upon the police. The actual pellet gun was the best evidence of what the police

encountered when they entered the defendant's residence, and the state had the right to invite the jury to draw reasonable inferences from this evidence. During argument to the court, defense counsel indicated that the defendant did not believe that the police had acted in the performance of their duties during the events at issue. This sentiment was expressed to the jury during closing argument, when defense counsel argued that the police had acted outside the scope of their duties.[6] Contrary to the arguments of the defendant, evidence that any type of gun was present in the residence of a suspect whom the police believed may have been armed, was uncooperative with police and had been involved in a domestic dispute that gave rise to physical injury to a member of the suspect's household logically sheds light on why responding officers might have acted in a strong manner in apprehending such suspect. In light of the charges and the dispute concerning the reasonableness of the conduct of the police, we conclude that the evidence was relevant.

Also, as he did at trial, the defendant argues that the evidence was unduly prejudicial. "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly

---

[6] Defense counsel stated: "The police officers' actions were above and beyond what was, I would say, reasonably called for because this gentleman [the defendant] testified that he submitted; however, he still had to be thrown on a bed, jumped on top of. He testified that the bed itself had sort of like a memory foam thing and all these blankets, as you saw, making it difficult even to breathe. [He was] pulled on to the floor and he sustained injuries as a result. Police officers were kind enough to bring him . . . to the hospital. But, the fact remains that those injuries occurred as a result of this. It all goes back to the application of the facts to the law."

arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown." (Internal quotation marks omitted.) *State* v. *Bell*, 303 Conn. 246, 273, 33 A.3d 167 (2011).

The defendant urges us to conclude that all guns fall into the category of "inherently inflammatory evidence" that engenders "hostility toward the defendant and sympathy for the officer." We are not persuaded that the evidence at issue in the present case possessed any of these damaging qualities. There was uncontroverted testimony from police witnesses that the gun at issue was merely a pellet gun that functioned with the use of a carbon dioxide canister. Klein testified that he and Palmiero inspected it and that he readily could tell "it was not a real firearm. It was, in fact, a pellet gun." "Jurors are expected to bring their common sense and common experience to the deliberation process." *State* v. *Padua*, 273 Conn. 138, 159, 869 A.2d 192 (2005). For several reasons, we are not persuaded that the pellet gun at issue in the present case, as the defendant argues, was inherently inflammatory such that its prejudicial effect necessarily outweighed its probative value.

There was no evidence that the defendant owned the gun, ever used the gun, brandished the gun during the events at issue or that he even was aware that it was in the hallway at the time that the police entered the residence. In fact, the evidence was uncontroverted that R, who was sixteen years of age at the time of trial, was the owner of the gun, a gift from his brother. The state's argument related to the gun properly was limited to its effect upon the police who found it, not on whether the defendant should be viewed negatively

because it was in his residence. Finally, we note that the jury was instructed to base its decision on the evidence and, in so doing, "must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy." There is no indication that the jury did not follow this instruction.[7] In light of the slight, if any, prejudicial impact of the evidence at issue, we are not persuaded that it was unduly prejudicial to the defendant.

### III

Third, the defendant claims that the court improperly excluded defense testimony from Palmiero concerning the severity of injuries sustained by Brodacki at the scene of the crime. We disagree.

During the defendant's cross-examination of Palmiero, defense counsel asked Palmiero whether, between October 3, 2008, when police were at the defendant's residence responding to the domestic abuse complaint, and the time of trial, Palmiero had spoken with Anastasia. After Palmiero replied affirmatively, defense counsel asked him, "[a]nd what did you tell her?" At this point, the prosecutor objected to the inquiry on the ground of relevance, and the court heard argument outside of the presence of the jury. Defense counsel stated that he wanted to inquire with regard to statements Palmiero made to Anastasia concerning the injuries that Brodacki sustained at the scene of the crime.[8] Specifically, defense counsel stated that he had reason to

---

[7] In so concluding, we are mindful that the jury found the defendant not guilty of two of the crimes of which he stood charged. See footnote 1 of this opinion.

[8] Earlier during the presentation of evidence, Brodacki testified that when the defendant forcefully hurled "a big cluster of keys" at him, striking him in the face and arm, he experienced pain. Also, Brodacki testified that, while physically restraining the uncooperative defendant, he sustained an injury to his shin. Absent objection, the state introduced photographs taken contemporaneously with the incident at the defendant's residence that depicted the injuries. Brodacki testified that he did not obtain medical treatment for his injuries.

believe that Palmiero made statements to Anastasia suggesting that Brodacki had not sustained injury or experienced pain, that he was physically fine. Defense counsel argued that the evidence was relevant to the issue of whether or not Brodacki was injured, an issue that was integral to the charge of assault of public safety personnel in violation of § 53a-167c (a) (1). Also, defense counsel stated that the questioning may be relevant for purposes of challenging Brodacki's credibility.

The prosecutor argued that the inquiry was not relevant because Brodacki already had testified that he had sustained minor injuries and that he had experienced pain, something that only could have been experienced by Brodacki. On these points, the prosecutor observed, the defendant had not cross-examined Brodacki. Outside of the jury's presence, defense counsel examined Palmiero, who testified that he did not recall making any statements to Anastasia concerning any injuries that Brodacki may have sustained during the incident. At that point, the court sustained the state's objection.

Then, defense counsel asked to make an offer of proof as to testimony that Anastasia might provide in the event that the defense wished to demonstrate that Palmiero had made "some sort of prior inconsistent statement" to her. The court characterized the offer of proof as follows: "[T]here was some sort of conversation subsequent to the event between [Palmiero] and Anastasia in which [Palmiero] may have said, 'Don't worry, [Brodacki's] fine, you know, there's nothing wrong with him' or something to that extent." As the court observed, the offer of proof encompassed general observations of a police officer, observations that were unrelated to the degree of pain, if any, that was experienced by Brodacki. Defense counsel stated that, to his knowledge based on his conversations with Anastasia, Palmiero merely told Anastasia that Brodacki was

"okay," "fine" and that "his injury [was] nothing." The court observed that the offer of proof did not materially contradict Brodacki's testimony and did not shed any light on the issue of whether or not Brodacki had experienced pain for even a brief moment. Accordingly, the court affirmed its ruling sustaining the state's objection.

The defendant claims that the court improperly sustained the state's objection because the evidence he sought to introduce was the out-of-court statement of one investigating police officer to another. The defendant urges this court to adopt the novel legal proposition that police officers in criminal prosecutions are akin to parties in civil proceedings and, thus, their out-of-court statements are admissible as the admissions of a party opponent.

The defendant did not raise this theory of admissibility before the trial court. Accordingly, we need not consider it on appeal. See footnote 5 of this opinion. Moreover, even if we were to adopt the defendant's theory of law, the defendant does not argue before this court that the trial court improperly determined that the evidence was irrelevant. That is, the defendant's argument assumes that the excluded inquiry was relevant to an issue before the jury. Because the defendant has presented this court with an unpreserved claim of error and has not challenged the specific ground on which the court excluded the evidence, we reject the defendant's claim.

IV

Finally, the defendant claims that the court improperly permitted the state to impeach the defendant by means of a full protective order issued following his arrest. We agree that the court erroneously permitted the state to present the full protective order, but we conclude that the error was harmless.

The defendant testified at trial and, during his direct examination, defense counsel asked him how long he had lived in Weston. The defendant testified that he moved to Weston in 1958. Referring to the address of the residence the defendant shared with Anastasia, defense counsel asked, "How long have you occupied that dwelling?" The defendant replied, "About fifteen to sixteen years." During cross-examination, the prosecutor asked the defendant, "And as part of your arraignment, sir, isn't it true that a full protective order was issued against you by the court, sir?" The defendant answered affirmatively. Then, the prosecutor showed the defendant a copy of the full protective order that was issued against him on October 3, 2008, which was marked for identification only. Defense counsel objected to the prosecutor's inquiry with regard to the specific terms of the protective order.

The court heard argument outside of the jury's presence. The prosecutor represented that the full protective order issued against the defendant on October 3, 2008, included a provision that precluded the defendant from entering the residence in Weston that he shared with Anastasia and R. The prosecutor represented that the order was modified on April 1, 2009, at which time the defendant legally was permitted to return to the residence. Essentially, the prosecutor argued that she was entitled to present evidence of the protective order to impeach the defendant's testimony that he had resided at the Weston residence for the prior fifteen to sixteen years. Defense counsel argued that the evidence was collateral to any issue before the jury, that it was not relevant because there was no claim that the defendant violated the protective order. The court overruled the defendant's objection.

Thereafter, the state inquired as to various terms of the protective order. The defendant admitted that the protective order prohibited him from all contact with

Anastasia and R, which included restraining, threatening, harassing, stalking, assaulting, molesting, sexually assaulting or attacking Anastasia or R. The state elicited testimony from the defendant that, until its modification on April 1, 2009, the protective order prohibited him from entering the residence. The defendant explained that his earlier testimony during his direct examination, that he had lived at the residence for fifteen to sixteen years, referred to events prior to October 3, 2008. Over the defendant's objection, the court marked the full protective order and the modified protective order as full exhibits. The prosecutor elicited testimony from the defendant that, although the protective order was modified on April 1, 2009, permitting the defendant to return to the residence, it remained in effect at the time of trial insofar as it prohibited the defendant from engaging in certain conduct against Anastasia and R. Also, the prosecutor elicited testimony from the defendant that the modification to the protective order followed his successful completion of alcohol treatment and drug testing.[9]

As he did at trial, the defendant argues that the court improperly permitted the state to present evidence of

[9] During closing argument, the prosecutor referred to the evidence concerning the protective order. Specifically, the prosecutor stated: "[The defendant] gets arraigned. There's a protective order. And the importance to know about that, ladies and gentlemen, the protective order did kick him out of the house. It was court-ordered for the safety and the protection of Donna Anastasia and [R] that [the defendant] went out of the house. It was signed by a judge. So even if Ms. Anastasia wanted him back, it was court-ordered that he get out of the house. And read the protective order, you'll see all of the things that he could not—he could not be violent, he could not have contact, he could not come to her place of employment. And it applied to [her] and [R] for their safety and protection. It's a protective order. It's still in place now.

"So, even though six months later it was modified after he got alcohol treatment and he's back in the house, he still has, and read the modification, he still has restrictions on him that he is not to be violent or threatening or harassing those people. His peacefulness right now is court-ordered, that he can't do anything."

the full protective order for the purpose of impeaching his testimony. The defendant contends that the court's ruling permitted the state to introduce into the trial evidence of a purely collateral issue, evidence that suggested that the defendant was an especially dangerous person. The defendant argues that even if his direct examination testimony reasonably could be construed to suggest that he had lived in the Weston residence continuously for fifteen to sixteen years prior to trial, the evidence was highly prejudicial.[10]

The state offered the evidence at issue solely for the purpose of impeachment, specifically, to demonstrate that the defendant testified untruthfully during his direct examination with regard to the length of time he had occupied the Weston residence. Insofar as the protective order was evidence that the defendant did not occupy the residence continuously for the fifteen to sixteen years prior to trial, we conclude that the relevance of this evidence was minimal. The evidence was unrelated to the defendant's alleged criminal conduct; the protective order was issued after the events underlying the charges and there was no suggestion made at trial that the defendant had not complied with the protective order or the modified protective order. Whether the defendant continually occupied the residence was not a material issue at trial. Additionally, there was no obvious impeachment value associated with the challenged evidence. The defendant did not testify that he *continuously* had occupied the Weston residence for the fifteen to sixteen years prior to trial,

---

[10] Although the defendant asserts that his objection at trial was based on relevancy and undue prejudice, our careful review of the record reflects that, at trial, the defendant did not argue that the evidence was unduly prejudicial. Consequently, the court did not make a finding that the probative value of the evidence outweighed its prejudicial effect, if any. Confining our review to the grounds of the objection raised at trial, we do not consider whether the evidence was inadmissible because of its prejudicial effect. See footnote 5 of this opinion.

but merely that he had "occupied that dwelling" for "[a]bout fifteen to sixteen years." For the evidence to have any impeachment value, the jury would have to infer that the defendant had testified in the manner suggested by the state.[11]

The evidence concerning the protective order, however, was not related solely to the issue of the defendant's occupancy of the Weston residence. The state argued before the trial court that the protective order was relevant for the limited purpose of impeachment, but the court permitted the state to introduce and question the defendant about the entire protective order and modified protective order. Thus, the evidence and questioning involved not merely the restriction placed on the defendant's legal right to enter the family dwelling, which would have had the marginal impeachment value discussed previously, but all of the restrictions placed on his interactions with Anastasia and R. On this record, we are left to conclude that the admission of the full protective order, not merely evidence related to the issue of the length of time the defendant occupied the Weston residence, reflected an abuse of the court's discretion.

Our determination that the full protective order was not relevant does not end our analysis, for, in accordance with the principles discussed previously in this opinion; see State v. Thomas, supra, 110 Conn. App. 718–19; the defendant bears the burden of demonstrating that the erroneous ruling was harmful. For several reasons, we conclude that the defendant has not demonstrated that the ruling was harmful. First, the evidence did not relate to any essential element of the crimes of which the defendant was convicted, but to a collateral

---

[11] In its brief, the state asserts that the evidence was "relevant to rebut the implication of the defendant's testimony that he had resided uninterrupted at the family residence for sixteen years."

issue raised for the purpose of impeaching the defendant. On this record, we do not conclude that the state based its case upon improperly admitted evidence.

Second, the court did not restrict the defendant's ability to present additional evidence to rebut the improperly admitted evidence. The record reflects that defense counsel presented Anastasia's testimony that she first learned about the existence of the protective order following the defendant's arraignment, when a police detective provided her with a copy of it. Anastasia testified that on several occasions she attempted to have the protective order modified so that she could have contact with the defendant and, ultimately, the defendant could return to the family residence. Anastasia testified that the court modified the order, permitting the defendant to return to the family residence on April 1, 2009. Certainly, this testimony would have weighed heavily against any negative implications that may have been associated with the evidence of the full protective order.

Third, insofar as the defendant asserts that the protective order unfairly portrayed him as an unusually violent person who posed a danger to Anastasia and R following his arrest, the record does not reflect that it had any detrimental impact on the jury's deliberations. The jury returned a not guilty verdict with regard to the only charges, namely, assault in the second degree and risk of injury to a child, which arose from the defendant's alleged violent conduct toward a member of his household, R. The fact that the court found the defendant not guilty of these charges leads us to conclude that the evidence was not particularly damaging to the defense. Thus, insofar as the likely prejudice that followed the admission of the full protective order was the implication that the defendant possibly posed a danger to Anastasia and R, we are not persuaded that it likely affected the jury's verdict with regard to the

crimes of which he was convicted, which involved the defendant's conduct toward the police officers who responded to his residence on October 2, 2008.

Fourth, the state presented strong evidence against the defendant. The evidence included the testimony of multiple witnesses who observed the defendant's conduct during the events at issue.

Fifth, in evaluating the likely "impact of the evidence on the trier of fact and the result of the trial"; (internal quotation marks omitted) id., 719; we conclude that it was not likely that the improperly admitted evidence was very damaging to the defense. The defendant logically argues that the fact that the court issued a protective order was unfavorable to him, for it reasonably suggested, apart from the evidence related to the crimes with which he was charged, that he posed a potential danger to Anastasia and R. Nonetheless, the prosecutor did not suggest that the defendant failed to comply with the protective order. Anastasia's testimony demonstrated that she did not seek the issuance of the protective order but viewed it unfavorably. Anastasia's testimony that she wanted to have contact with the defendant and that she made several efforts to have the order modified, as well as the evidence that the order was modified, certainly tended to demonstrate that the defendant did not pose such a danger.

On the basis of our consideration of all of these factors, we are left with a fair assurance that the admission of the full protective order did not substantially affect the verdict rendered in this case. Accordingly, we conclude that the admission of the evidence at issue was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.