******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANGEL
CARRASQUILLO
(AC 41806)

Keller, Elgo and Bishop, Js.

*Syllabus*

Convicted of the crimes of murder and criminal possession of a firearm
in connection with the shooting deaths of the victims, the defendant
appealed, claiming, inter alia, that the trial court violated his rights to
due process and to a jury trial by coercing the jury to reach a verdict.
On the sixth and final day of the jury's deliberations, the court received
five notes from the jury. The first note stated that the jury was unable
to reach a unanimous verdict. The next two notes were from two jurors,
N and D, about personal matters that conflicted with their service as
jurors. The court told the jury that it would take up the notes from N
and D later in the day after it gave the jury an instruction to continue
its deliberations in an effort to reach a unanimous verdict. The court
then gave the jury a standard Chip Smith instruction in which it directed
the jury to try to break its deadlock by continuing to deliberate, and
stated that minority view jurors should consider the logic of the majority
view jurors and that it was the jurors' obligation as individuals to give
their own verdict without surrendering their conscientiously held views.
Defense counsel did not object to the court's instruction. Thereafter,
the court received a note from another juror, L, in which L stated that
she was feeling attacked as a juror, thanked the court for its guidelines
and was willing to keep an open mind and continue talking. Subse-
quently, the court received the fifth note from the jury stating that it
had reached a unanimous verdict. The court thereafter summoned the
jury to the courtroom, the verdict was announced, and the jury was
polled, with each juror expressing agreement with the verdict. At sen-
tencing, the court denied the defendant's motion for a mistrial in which
he claimed, inter alia, that the court had not fully explored the note
from L at the time it received the note during trial. On the defendant's
appeal, *held*:

1. The defendant could not prevail on his unpreserved claim that he was
deprived of his rights to due process and to a jury trial because the trial
court applied improper pressure on the jury to reach a verdict when it
delivered the Chip Smith instruction: the defendant's claim that the jury
would have believed that it would not be excused at the end of the day
if it did not reach a verdict was unavailing, as the court did not state
that the jury did not need to reach a verdict in order to be excused, the
court suggested in the Chip Smith instruction that it would wait as long
as it took the jury to reach a unanimous verdict, the jury had been
excused at the end of each of the five prior days of deliberations, the
court permitted the jury to be excused for the day on which it received
a note from a juror that stated that deliberations were getting very
heated and that continued deliberations would not be beneficial, and
the court did not state before or during the Chip Smith instruction that
the jury was expected or required to reach a verdict at any particular
time; moreover, the court's statement in its initial jury charge that the
jury was duty bound to return a verdict with respect to each count did
not suggest that the court would not accept the jury's failure to reach
a unanimous verdict, but merely expressed that a verdict must be unani-
mous, and the defendant was incorrect in claiming that the court did
not respond to N's note, which simply alerted the court to the existence
of a family emergency that would require N's absence beginning on a
certain date, as the court stated that it would address any scheduling
conflicts of jurors later that day, defense counsel, who had agreed with
the court's response to N's note, did not ask the court to conduct further
inquiry of N, and N's note did not suggest that he was distracted, agitated
or likely to have felt pressured to agree or to cause other jurors to agree
with his view of the case; furthermore, the court did not, as claimed by
the defendant, sanction the pressure that L was under from other mem-
bers of the jury, as defense counsel declined the opportunity to canvass

L with respect to her note, which was not evidence of continued undue pressure on her or any minority view juror, nothing in the note reflected that she was unwilling to follow the court's Chip Smith instruction, and the court reasonably could have interpreted the note to reflect that, after it delivered its Chip Smith instruction, L felt better about continuing her deliberations with the rest of the jury, and the two hours of jury deliberations after the Chip Smith instruction did not suggest that the court coerced the jury to reach a unanimous verdict, as the jury had spent a lengthy amount of time in the prior days of deliberation listening to the playback of testimony, there was no mathematical formula to determine whether the amount of time between additional deliberation following a Chip Smith instruction and the verdict indicated that the jury was coerced into reaching a verdict, and no juror expressed hesitation or disagreement with respect to the verdict when the jurors were individually polled.

2. The trial court did not abuse its discretion in denying the defendant's motion for a mistrial: the defendant waived any claim that the court failed to canvass L at the time it received her note, and the fact that the jury had difficulty reaching a unanimous verdict but then did so after further instruction and deliberation did not give rise to a concern that the jury was coerced into reaching its verdict, as it was reasonable to infer that L's note was a strong indication that the court's Chip Smith instruction was effective and that, despite any hostility during deliberations, she was open-minded and ready to continue talking with the other jurors; moreover, the jury deliberated for two additional hours after it received the Chip Smith instruction before reaching its verdict, and, at the defendant's request, the jurors, including L, were polled individually and expressed not even the slightest reservation or disagreement concerning the verdict.

3. The defendant could not prevail on his unpreserved claim that he was denied his right to due process because the trial court's response to a note from the jury about accessorial liability as to the murder charges against him created a reasonable possibility that the jury was misled about the state's burden of proof:

a. The defendant waived any objection to the court's jury instructions concerning accessorial liability and, thus, could not prevail under *State* v. *Golding* (213 Conn. 233); the court provided counsel with a copy of its proposed jury instructions, allowed a meaningful opportunity for review of its instructions, solicited comments from counsel, and defense counsel affirmatively stated that the defendant's only exceptions concerned other portions of the charge, and after the jury sent its note to the court with respect to the accessorial liability instruction, defense counsel agreed with the court's proposed response to the note, which was to ask the jury for further clarification regarding what it was asking in the note, did not ask the court to take further action when the jury did not provide the court with another note concerning the instruction at issue, and specifically stated that further instruction was not necessary.

b. The defendant's claim that the court's jury instruction on accessorial liability constituted plain error was unavailing, as the defendant failed to demonstrate the existence of an instructional error that was so obvious that it affected the fairness and integrity of and public confidence in the judicial proceedings; the court's instruction did not create the possibility of confusion in the minds of the jurors as to what evidence the state relied on in support of the murder counts or with respect to the mental state required for the commission of murder as an accessory, as the court repeatedly instructed the jury that it must find that, if the defendant intentionally aided others in the commission of the crime of murder, he acted with the mental state necessary for the commission of murder and that this mental state consisted of the intent to kill another person.

Argued March 5—officially released August 6, 2019

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of murder and criminal possession of a firearm, and with the crime of conspiracy to commit murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury

before *Bentivegna, J.*; verdict of guilty of two counts of murder and one count of criminal possession of a firearm; thereafter, the court denied the defendant's motion for a mistrial and rendered judgment in accordance with the verdict, from which the defendant appealed. *Affirmed.*

*Jennifer Bourn*, supervisory assistant public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk* and *Donna Mambrino*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Angel Carrasquillo, appeals from the judgment of conviction, rendered following a jury trial, of two counts of murder as an accessory in violation of General Statutes §§ 53a-8 and 53a-54a, and one count of criminal possession of a firearm in violation of General Statutes § 53a-217.[1] The defendant claims that the trial court (1) deprived him of his right to due process and his right to a jury trial by coercing the jury to reach a verdict, (2) improperly denied his motion for a mistrial and his request for a postverdict inquiry into jury coercion, and (3) deprived him of his right to due process by failing to provide the jury with additional guidance with respect to the principle of accessorial liability. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that prior to and during the events underlying this appeal, the defendant, Luis Quintero, and Josue Burgos were members of a street gang that was involved in the sale of illegal drugs. On October 13, 2009, the defendant, Quintero, and Burgos discovered that Luis Rodriguez, who was not a gang member, was selling illegal drugs at a home on Wethersfield Avenue in Hartford. Rodriguez engaged in this activity despite the fact that one or more gang members had warned him not to sell drugs in this area, as the gang considered it to be part of its territory.

The defendant, Quintero, and Burgos confronted Rodriguez at the home on Wethersfield Avenue. Leida Franqui, who was not a gang member, was with Rodriguez. The defendant wanted a .25 caliber handgun that he knew was in Rodriguez' possession. He physically struck Rodriguez, rendering him unconscious. He took possession of Rodriguez' cell phone and handgun. The defendant was driven to and from the scene by his girlfriend, Nicole Rodrick. After Rodriguez regained consciousness, he called his cell phone and asked the defendant to return it to him. The defendant agreed to meet with Rodriguez to return his cell phone but not his handgun.

In the early morning hours of October 14, 2009, Rodrick drove the defendant, Quintero, and Burgos, all of whom were armed, to Benton Street in Hartford to meet with Rodriguez and Franqui, both of whom were unarmed. At or about 2 a.m., as the group of five was walking in the vicinity of the intersection of Franklin Avenue and Whitmore Street in Hartford, an argument ensued. The defendant, Quintero, and Burgos shot Rodriguez and, soon thereafter, Franqui. By the time that police arrived on the scene, Rodrick had driven the defendant and his accomplices away from the scene of the shooting, and Rodriguez and Franqui had died as a result of multiple gunshot wounds, including gunshot

wounds to the head. Medical examiners subsequently recovered nine millimeter and .22 caliber bullet fragments from the victims' bodies.

Rodrick drove the defendant to her East Hartford residence. There, the defendant, who was still in possession of Rodriguez' handgun, accidentally discharged the handgun and thereby caused an injury to his left leg. Rodrick tended to his injury, which was not significant. Later that morning, the defendant went to the residence of a fellow gang member, Rosemary Pinto. There, he asked a fellow gang member, Juan Gonzalez, to hold the gun for him, and he commented that he "killed them mothafuckers."

The defendant subsequently made additional incriminating statements concerning the shooting. On multiple occasions, a police detective, Luis Poma, questioned the defendant about the events at issue. On October 15, 2009, the defendant denied that he was involved in the shooting and stated that he had an alibi. On October 23, 2009, the defendant admitted that he had taken Rodriguez' gun and cell phone, and then stated that Burgos was the shooter. On June 22, 2010, the defendant asked Poma whether three guns had been used in the shooting, thereby referring to information about the shooting that was not made public. Then, the defendant stated to Poma that he was at the scene of the shooting, but that Quintero and Burgos had shot the victims. The defendant admitted that he took Rodriguez' handgun, accidentally shot himself in the leg, and gave the handgun to Gonzalez to dispose of it. On February 7, 2013, the defendant contradicted his earlier statement that he was present at the scene of the shooting, and that Quintero and Burgos were the shooters. He admitted, however, that he had taken Rodriguez' gun and cell phone, had accidentally shot himself with the gun, and later had given the gun to Gonzalez.

In 2011, the defendant was incarcerated in connection with an unrelated incident. He admitted to a fellow gang member and inmate, Luis Rojas, that the events surrounding the shooting of Rodriguez and Franqui did not go as he had planned. He admitted to Rojas that he had shot Rodriguez because it appeared to him that Rodriguez was reaching for a gun, and that he had shot Franqui because she witnessed him shoot Rodriguez. With respect to his shooting of Franqui, the defendant explained to Rojas that "it was part of the game . . . . She had to go because she seen it." Additional facts will be set forth as necessary.

I

First, the defendant claims that the court deprived him of his right to due process and his right to a jury trial by coercing the jury to reach a verdict. We disagree.

The following additional facts are relevant to this claim. After jury selection was completed,[2] the jury

heard evidence over the course of seven days. The presentation of evidence began on October 26, 2015, and concluded on November 4, 2015. Following closing arguments and the jury charge, the jury began its deliberations on November 5, 2015, and the deliberations took place over the course of six days. The jury announced its verdict on November 13, 2015. Using written notes, the jury or members of the jury communicated with the court on many occasions during the jury deliberations. On November 5, 2015, the first day of the jury's deliberations, the jury requested additional copies of the court's written instructions and asked for clarification with regard to the court's instructions. In another note, the jury also asked to see an exhibit that was marked for identification purposes only or, in the alternative, to rehear certain testimony. On November 6, 2015, the second day of the jury's deliberations, the jury asked to rehear the testimony of three witnesses. The court responded to these requests.

On November 10, 2015, the fourth day of the jury's deliberations, the jury asked the court for clarification with respect to the court's instructions and to rehear certain testimony. The court responded to these requests. At 4:13 p.m., the jury sent the court two notes. In the first note, the jury asked whether it could begin its deliberations at 10:45 a.m. on November 12, 2015, to accommodate a personal commitment made by a juror to speak at a high school. The second note stated: "The jury, while willing to deliberate, is getting very heated, and would do well with a short stop for today. We are willing to continue deliberating but at this time it is not beneficial." The court responded to these requests by adjourning for the day and permitting the jury to resume its deliberations at 10:45 a.m. on November 12, 2015.[3]

On November 12, 2015, the fifth day of the jury's deliberations, the jury sent the court three notes. In the first note, the jury asked the court to rehear certain testimony. The court complied with the request. In the second note, the jury asked for further guidance with respect to accessorial liability and "the separate theories of liability." The court responded to the jury's inquiry by noting that it already had provided the jury with an instruction concerning accessorial liability, but invited the jury to make additional inquiries as necessary. The third note was from a juror, M.P.[4] During jury selection, the court had informed M.P. that it expected the trial to be completed by November 13, 2015. At that time, M.P. stated that he would not be available to serve as a juror after November 10, 2015. The court responded that there was a "very strong likelihood" that the trial would be completed by November 10, 2015, and M.P. was selected as a juror. In the note that M.P. sent to the court on November 12, 2015, however, M.P. stated that he would be available to participate in the trial on November 13, 2015. Before the court excused the jury

for the day, it explained to the jury that Attorney J. Patten Brown III, who had represented the defendant during the trial until this point in time, would not be present in court on November 13, 2015, but that Brown's associate, Attorney Alex Glomb, would be present.[5]

On November 13, 2015, the sixth and final day of the jury's deliberations, the court received five notes from the jury. The court received the first three notes at 10:57 a.m. In the first note, the jury stated: "We are at a place where we are not able to come to a unanimous decision. We have on one count but are not able to on [counts] 1-4. We would [like] guidance." In the second note, juror D.N. indicated that because of a medical emergency involving a close relative, he would be unable to continue to serve on the jury after November 13, 2015.[6] In the third note, juror J.D. stated in relevant part: "I am unable to be at court for jury deliberations on Monday, [November 16, 2015] due to prior engagement in NC. I can return for Tuesday, [November 17, 2015] for deliberations if necessary. If this is not possible, I would ask to be excused from the jury. Thank you."

Upon receipt of these notes, the court, in the absence of the jury, conferred with counsel. The court made a general observation that, if the jury's deliberations were to go beyond November 13, 2015, there would be an issue concerning juror availability. Then, in response to the jury's note concerning its inability to reach a verdict, it proposed delivering the standard Chip Smith[7] instruction to the jury, providing the jury with copies of the instruction, and asking the jury to continue its deliberations. The court provided counsel with a copy of the instruction. The court also stated that it would "indicate to the jurors who have conflicts after today that we'll take that up later in the day." The court asked counsel if there was any objection to proceeding in this manner, and both the prosecutor and defense counsel replied that there was no objection.

The court summoned the jury to the courtroom and stated: "We've received three notes from the jury this morning, and I just want to go over those and explain what the next steps in the process are.

"The first note has been marked as court exhibit 25, and it reads: We are at a place where we are not able to come to a unanimous decision. We have on one count but are not able to on count one through four. And then it says, I'm assuming, we would like guidance. The jury instruction that you've been provided with is the additional guidance that I'm going to provide.

"We have also received two other notes from . . . individual jurors, which have been marked as court exhibit 26 and court exhibit 27. At this point we'll address that issue later today, after I give you this instruction and ask that you continue with your deliberations.

"So, this is . . . the instruction to give when the jury is having difficulty agreeing as to a verdict:

"The instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict. Along these lines I would like to state the following to you:

"The verdict to which each of you agrees must express your own conclusion, and not merely the acquiescence and the conclusion of your fellow jurors. Yet, in order to bring your minds to a unanimous result you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other. In conferring together you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments.

"If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent, [and] who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath.

"But please remember this: do not ever change your mind just because the other jurors see things differently or to get the case over with. As I told you before, in the end your vote must be exactly that: your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

"What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry.

"All right. So, at this point I'm going to ask that you return to the jury room to continue with your deliberations and then we'll await any additional notes. Thank you." Both the prosecutor and defense counsel affirmatively stated that they did not have any further comments.

At 11:30 a.m., the court received the fourth note of the day. The note was from juror L.D. and stated: "I would like the court to know that I am feeling attacked as a juror. Thank you for giving us guidelines. I am willing to keep an open mind and continue talking but I felt very attacked yesterday." The court shared the note with the prosecutor and defense counsel, both of whom indicated that they did not want the court to canvass L.D. Glomb did not state that he needed to discuss the matter with Brown. The court did not take any further action with respect to the note.

At 2:39 p.m., the court received the fifth note of the day, which stated: "We have the verdict! All counts 1-

5." The court summoned the jury to the courtroom, and the foreperson announced the jury's finding of guilt with respect to counts one (murder), two (murder), and five (criminal possession of a firearm). The foreperson announced the jury's finding of not guilty with respect to counts three (conspiracy to commit murder) and count four (criminal possession of a firearm). The court accepted the verdict and ordered that it be recorded. At the defendant's request, the jurors were individually polled, and each juror affirmatively expressed his or her agreement with the verdict. The court asked the prosecutor and defense counsel if they were in agreement that a unanimous verdict had been reached. The prosecutor and defense counsel replied affirmatively.

For the first time on appeal, the defendant claims that in light of the unique circumstances that existed at the time that the court delivered the Chip Smith instruction, the court's use of the instruction was impermissibly coercive and, thus, denied him his right to due process and his right to a jury trial. His claim does not necessarily focus on the propriety of the court's Chip Smith instruction, but he contends that, in the present case, "the court's response to the deadlock note created pressure and exacerbated existing pressures on the jury, particularly the minority view juror(s), and that all the coercive circumstances denied [him of] his right to a fair jury trial." The defendant argues that the claim is reviewable pursuant to the bypass doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[8] Additionally, the defendant invites us to conclude that reversal of the judgment is warranted under the plain error doctrine.[9] See Practice Book § 60-5.

In the defendant's view, the court put undue pressure on the jury to reach a verdict[10] because (1) the court "used a particularly coercive anti-deadlock instruction, directing only minority view jurors to reconsider their position in light of the opinion of the majority"; (2) during jury selection, the court told prospective jurors that it did not believe that the trial would continue beyond Friday, November 13, 2015, and it delivered the Chip Smith instruction following five days of deliberations and without first responding to the notes sent by D.N. and J.D., who had informed the court that they would be unable to continue to serve as jurors if the trial continued to Monday, November 16, 2015; (3) "[t]he jury was left to wonder if the court would require deliberations to continue beyond [November 13, 2015] and whether it must reach a verdict to be excused"; (4) D.N. informed the court that he would be unable to serve after November 13, 2015, but the court did not respond or determine whether his circumstance was causing him pressure to ensure that a verdict was reached; (5) L.D. informed the court that she had felt "attacked" during the deliberations, but the court's lack of

response to L.D. and its Chip Smith instruction likely indicated to the jury that "such pressures" placed on minority view jurors were "sanctioned by the court"; and (6) the jury had deliberated for more than five days and was unable to reach a verdict but, following the Chip Smith instruction, the jury deliberated for only two additional hours before reaching a verdict.

We begin our analysis under *Golding* by observing that the record affords us the ability to review the instructions provided to the jury as well as the relevant circumstances under which the court's instructions were given. Moreover, the defendant's claim is based on a violation of his rights to due process and a jury trial under the federal constitution and, thus, is constitutional in magnitude. Because the claim is reviewable under *Golding*, we turn to an examination of whether the alleged constitutional violation exists and whether it deprived him of a fair trial. Because the claim presents a question of law, our review is plenary. See, e.g., *State* v. *Brown*, 299 Conn. 640, 650, 11 A.3d 663 (2011) (questions of law afforded plenary review).

"A jury that is coerced in its deliberations deprives the defendant of his right to a fair trial under the sixth and fourteenth amendments to the federal constitution, and article first, § 8, of the state constitution. Whether a jury [was] coerced by statements of the trial judge is to be determined by an examination of the record. . . . The question is whether in the context and under the circumstances in which the statements were made, the jury [was], actually, or even probably, misled or coerced." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 427, 736 A.2d 857 (1999); accord *State* v. *Daley*, 161 Conn. App. 861, 866, 129 A.3d 190 (2015), cert. denied, 320 Conn. 919, 132 A.3d 1093 (2016). We recognize that "a defendant is not entitled to an instruction that a jury may hang . . . [but] he is entitled to a jury unfettered by an order to decide." (Internal quotation marks omitted.) *State* v. *Breton*, 235 Conn. 206, 239, 663 A.2d 1026 (1995).

"Since 1881, our Supreme Court has approved of instructing deadlocked juries that they should continue to deliberate, with minority view jurors considering the logic of the majority view jurors as they did so. . . . In *State* v. *O'Neil*, 261 Conn. 49, 59, 801 A.2d 730 (2002), although our Supreme Court continued to uphold such instructions, it also recognized the potential for the coercion of minority view jurors. Specifically, our Supreme Court concluded that instructing jurors to consider the opinions of majority view jurors is an acceptable method of facilitating the deliberative process when faced with a deadlocked jury, but that the court must balance the instruction with a cautionary reminder to jurors of their obligation as individuals to give their own verdict without surrendering their conscientiously held views. Id., 73. Although reaching a unanimous ver-

dict is an important public policy goal; id., 74; the defendant's due process rights also must be protected, and the defendant has the right to 'have each and every juror vote his or her conscience irrespective of whether such vote results in a hung jury.' Id., 76.

"To ensure that such a cautionary reminder be given by our trial courts in future cases, our Supreme Court adopted the following language as a model instruction: 'The instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict.

" 'Along these lines, I would like to state the following to you. The verdict to which each of you agrees must express your own conclusion and not merely the acquiescence in the conclusion of your fellow jurors. Yet, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.

" 'In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath.

" 'But please remember this. Do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

" 'What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry.' . . . Id., 74–75.

"Since *O'Neil*, our courts have used such cautionary language in what has become known as a Chip Smith charge when instructing a deadlocked jury to consider the majority view. Such language is not required, however, when the court merely tells jurors to continue deliberating without instructing them in a potentially coercive manner." *State* v. *Mitchell*, 170 Conn. App. 317, 324–25, 154 A.3d 528, cert. denied, 325 Conn. 902, 157 A.3d 1146 (2017). "[A] Chip Smith charge, while encouraging a continued search for unanimity, also stresses that each juror's vote must be his [or her] own conclusion and not a mere acquiescence in the conclusions of his [or her] fellows . . . . The language of the charge

does not direct a verdict, but encourages it." (Citation omitted; internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 440, 778 A.2d 812 (2001).

With respect to the court's Chip Smith instruction, the defendant argues both that the instruction is "[not] always unduly coercive" but that he nonetheless "believes *O'Neil* was wrongly decided and [that] the better approach would be not to give an instruction singling out minority view jurors . . . ." We observe that the court's Chip Smith instruction mirrored that approved by our Supreme Court in *State* v. *O'Neil*, supra, 261 Conn. 59. Moreover, defense counsel did not object to the court's instruction.[11] To the extent that the defendant urges this court to conclude that *O'Neil* was wrongly decided, we unequivocally decline to do so. See, e.g., *State* v. *LaFleur*, 156 Conn. App. 289, 302–303, 113 A.3d 472 (this court is unable to overrule, reevaluate, or reexamine controlling precedent of our Supreme Court), cert. denied, 317 Conn. 906, 114 A.3d 1221 (2015).

To the extent that the defendant argues that the circumstances in which the court delivered the Chip Smith instruction resulted in the court's having applied improper pressure on the jury to reach a verdict, we reject this argument. The defendant focuses on the fact that the court delivered the instruction on a Friday morning, following five days of deliberations, and that two jurors had notified the court that they would be unable to deliberate on Monday. Moreover, the defendant focuses on the fact that, during jury selection, the court informed the jurors that it anticipated that the trial would be completed by November 13, 2015, the day on which the court delivered the Chip Smith instruction and the jury reached its verdict. The court's statements during jury selection plainly were intended to determine whether prospective jurors were available to serve as jurors during the dates of the trial and, in light of all of the court's later instructions to the jury concerning its deliberations, may not reasonably be interpreted to suggest that a verdict by November 13, 2015, was expected or required by the court. The court neither instructed the jury nor implied that it was required to reach a verdict or that it was required to reach a verdict at a particular time. See, e.g., *United States* v. *Badolato*, 710 F.2d 1509, 1514–15 (11th Cir. 1983) (fact that court did not instruct jury that it was required to reach verdict or that it was required to do so at that time weighed against conclusion that jury had been coerced).

Any concern that the jury may have believed that it was expected or required to reach a verdict on November 13, 2015, was readily addressed by the court in its Chip Smith instruction. The court did not state, in that instruction or prior to that instruction, that the jury was expected or required to reach a verdict on November

13, 2015, or at any particular time. Instead, the court emphasized that each juror was expected to honestly and in good conscience reach a conclusion, and that no juror should change his or her mind "to get the case over with." Moreover, the court concluded its instruction by stating: "What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry." There is no basis in the record to suggest that the jury either did not understand or did not follow this plain instruction.

The defendant argues that "[t]he jury was left to wonder if the court would require deliberations to continue beyond [November 13, 2015] and whether it must reach a verdict in order to be excused." He submits that the circumstances were coercive because "[t]he court did not advise the jury that it need not reach a verdict in order to be excused at the end of the day. To the contrary, it suggested that the court would wait as long as it took to reach a unanimous verdict." The defendant's argument is undermined by the fact that, prior to November 13, 2015, the jury had deliberated for five days. The jury did not reach a verdict on any of these prior days, yet it was excused at the end of each day. On November 10, 2015, the court received a note from the jury in which it stated that deliberations were "getting very heated" and that continued deliberations would not be "beneficial." In response to this note, the court permitted the jury to be excused for the day. In light of this prior experience of the jury, the defendant's argument that the jury would have believed that it would not be excused if it did not reach a verdict is not persuasive.

The defendant correctly observes that, in its jury charge, the court stated that the jury's "task" was to return a verdict and stated that, with respect to each count, the jury had the option of finding the defendant guilty or not guilty. Additionally, the defendant focuses on the fact that, during its charge, the court stated that the jury was "duty bound" to return a verdict of guilty or not guilty with respect to each count.

These statements in the court's charge, however, did not impermissibly suggest that the jury was required to reach a unanimous verdict. Reviewing the court's use of the phrase, "duty bound," in greater context reflects that the court did not suggest that it would not accept the jury's failure to reach a unanimous verdict, but merely that a verdict of guilty or not guilty must be unanimous. The court stated: "I impress upon you that you are duty bound as jurors to determine the facts on the basis of the evidence as it has been presented, to apply the law as I have outlined it, and then to render a verdict of guilty or not guilty as to each of the crimes charged. *When you reach a verdict, it must be unanimous.* It is the duty of each juror to discuss and consider

the opinions of the other jurors. *Despite that, in the last analysis, it is your individual duty to make up your own mind and to decide this case upon the basis of your own individual judgment and conscience.*" (Emphasis added.) In light of the fact that the jury sent several notes to the court during the course of its deliberations, including several notes in which it requested further instruction, we observe that, after it had received the Chip Smith instruction, the jury did not ask the court for any further clarification with respect to the instruction.

The defendant also focuses on the content of the note sent to the court by juror D.N. See footnote 6 of this opinion. The defendant argues that D.N.'s "circumstances suggest distraction, worry and pressure to finish to take care of this important and emotional family matter. The court did not respond, determine whether this was having a coercive effect on [D.N.] during deliberations—distracting or agitating him, pressuring him to agree, or causing him to pressure others to agree with him—or assure him that he would be excused at the end of the day on [November 13, 2015], whether or not there was a unanimous decision."

The defendant incorrectly states that the court did not respond to D.N.'s note. The record reflects that, after it had received the note and had summoned the jury to the courtroom to deliver its Chip Smith instruction, the court observed that it had received notes from D.N. and J.N., had marked them as court exhibits, and that it would "address that issue later today, after I give you this instruction and ask that you continue with your deliberations." The court asked the prosecutor and defense counsel if there was any objection to informing the jurors who had informed the court about scheduling conflicts that it would address the issue later that day. The prosecutor and defense counsel replied, "No, Your Honor."

Setting aside the fact that defense counsel agreed to the court's response to D.N.'s note, and that defense counsel did not ask the court to conduct any further inquiry, we are not persuaded that D.N.'s note suggests that he was distracted, agitated, or likely to have felt pressured to agree or to cause others to agree with his view of the case. D.N.'s note simply alerted the court to the existence of a family emergency that would require D.N.'s absence beginning on November 16, 2015, not sooner.

The defendant also focuses on the note that L.D. sent to the court, after the court delivered its Chip Smith instruction, in which she stated that she "felt very attacked [as a juror] *yesterday*." (Emphasis added.) The defendant argues that, by failing to address the note, the court somehow sanctioned the pressure that L.D. was under by other members of the jury and that its inaction "served to increase the pressures on the [other]

minority view jurors."

After the court received L.D.'s note, it shared it with the prosecutor and defense counsel. Defense counsel expressly declined the opportunity to canvass L.D. with respect to the note. Setting aside the fact that defense counsel thereby prompted the court's alleged "inaction" with respect to the note, we are not persuaded that the note reflects that, at the time L.D. sent the note to the court, it was evidence of continued undue pressure on L.D. or any other minority view jurors. As we have stated previously in this opinion, L.D. began the note by stating that she was "feeling attacked as a juror." Then, alluding to the court's Chip Smith instruction, she thanked the court for providing the deadlocked jury with additional guidance and indicated that she would "keep an open mind and continue talking . . . ." L.D. ended the note by using the past tense, stating that she "felt very attacked *yesterday*." (Emphasis added.) Viewing the note in its entirety, we conclude that the court reasonably could have interpreted the note to reflect that, after it delivered its Chip Smith instruction, L.D. felt better about continuing her deliberations with the rest of the members of the jury. Nothing about L.D.'s note reflects that she was unwilling to follow the court's Chip Smith instruction. To the contrary, consistent with the Chip Smith instruction, L.D. expressed her willingness to keep an open mind and to continue engaging in a dialogue with her fellow jurors. She did not state that she was unwilling to continue to serve as a juror or that she was inclined to abandon her conscience or to rush into agreeing on a verdict. Accordingly, we are not persuaded that L.D.'s note suggests that L.D. or any other member of the jury felt coerced into arriving at a verdict.

Finally, the parties agree that, following the Chip Smith instruction, the jury deliberated for approximately two hours before arriving at a verdict. Prior to the Chip Smith instruction, the jury indicated that it was deadlocked with respect to counts one through four of the state's information (in which the defendant was charged with two counts of murder, conspiracy to commit murder, and criminal possession of a firearm). The defendant argues that, because the jury deliberated for all or part of five days prior to the Chip Smith instruction, "the short time of additional deliberation [following the Chip Smith instruction] suggests coercion."

The defendant's argument is based on a comparison of the time that the jury spent deliberating following the Chip Smith instruction and the time it spent deliberating and listening to the playback of testimony during the five prior days of deliberation. It suffices to observe that, during the prior days of deliberation, the jury spent a lengthy amount of time listening to the playback of testimony from Rojas, Gonzalez, Rodrick, Poma, Detec-

tive Reginald Early, and Quintero. Our case law does not furnish a mathematical formula for this court to apply to determine whether the amount of time that has lapsed between a jury's additional deliberation following a Chip Smith instruction and its verdict indicates that the jury was coerced into reaching a verdict. We are not persuaded that the two hours of additional deliberation following the court's Chip Smith instruction reflected that impermissible coercion had been brought to bear by the court in the present case.

In conclusion, we are not persuaded that the court's Chip Smith instruction or the circumstances in which it was given reflect that the court coerced the jury into reaching a verdict.[12] Our conclusion is bolstered by the fact that, at the defendant's request, the members of the jury were individually polled with respect to their verdicts and that no juror expressed hesitation or disagreement with respect to the verdicts.

In light of the foregoing, we are not persuaded that the alleged constitutional violation exists and that the defendant was deprived of a fair trial. The claim fails under *Golding*'s third prong.[13]

## II

Next, the defendant claims that the court improperly denied his motion for a mistrial and his request for a postverdict inquiry into juror coercion. We disagree.

The following additional facts are relevant to the present claim. On January 21, 2016, the defendant filed a handwritten letter with the court in which he asked the court to set aside the verdict prior to the time of sentencing.[14] At the sentencing hearing on February 4, 2016, defense counsel, Brown, moved orally for a mistrial on several grounds. Defense counsel clarified that his arguments were based on the defendant's letter to the court, stating that he was discussing "things my client wanted me to state . . . all as a basis for a mistrial."

First, defense counsel stated, "[a]s you know, there was an issue with a juror note. My client doesn't feel that was fully explored." Although defense counsel did not explicitly state before the trial court that he was referring to the note sent to the court from L.D. on November 13, 2015, it appears from the prosecutor's arguments that she understood defense counsel's argument to be based on L.D.'s note. Moreover, in his appellate brief, the defendant has clarified that his argument was, in fact, based on L.D.'s note, which we have discussed more fully in part I of this opinion. Defense counsel admitted that he did not remember many of the details concerning "the juror note," such as whether it was sent before or after the court delivered its Chip Smith instruction, but he recalled that he "was consulted and . . . did speak with the court about that . . . . I just don't remember the substance of the con-

versation." The prosecutor reminded the court and Brown that Brown's associate, Glomb, was present at the time the note was sent to the court and that, at that time, Brown was available by phone. The prosecutor also reminded the court that, after it received the note, it did not believe any action needed to be taken with respect to the note and that, shortly thereafter, the jury sent a note to the court in which it indicated that it had reached a verdict.

Second, defense counsel argued that the defendant was of the opinion that the jury's verdict with respect to the murder and conspiracy counts was inconsistent. Third, defense counsel raised a claim seemingly based on prosecutorial impropriety by arguing that both he and the defendant believed that he had been "subject[ed] to many frivolous personal attacks both on and off the record, in and out of the court's presence, by the prosecutors alleging ethical violations that are non-existent." With respect to these alleged attacks, defense counsel stated that although the defendant believed that they were "done intentionally to affect [his] performance," he disagreed with the defendant that the attacks affected his representation of the defendant. Defense counsel stated that the first two grounds were "viable issues" in support of his motion for a mistrial. After hearing argument from the prosecutor, the court summarily denied the motion for a mistrial.

The defendant, relying solely on the ground related to the court's response to the jury note sent by L.D., now claims that the court abused its discretion in denying the motion for a mistrial. He also argues that the court abused its discretion in denying his request for a post-verdict inquiry into jury coercion. The defendant argues that "the court failed to conduct any inquiry on the record following L.D.'s note . . . . Given the coercive factors here, there are substantial grounds showing that [the] defendant was denied a fair trial."

As a preliminary matter, we observe that although the defendant couches the present claim as one in which the court improperly denied his motion for a mistrial and "abused its discretion in denying . . . [his] request for postverdict inquiry," we do not interpret the defendant's handwritten letter to the court, nor the arguments advanced by defense counsel at the time he argued for a mistrial, to have constituted a request for a further inquiry of one or more members of the jury. Likewise, the court did not explicitly state that it was denying a motion for a further inquiry of one or more jurors. Instead, the court stated: "If I'm going to treat this as a motion for a mistrial and any other postconviction motion, pursuant to Practice Book §§ 42-50 through 42-56, I'm going to deny the motion." Furthermore, in light of the arguments set forth in the defendant's appellate brief, we do not interpret the defendant's analysis of the present claim to be based on the court's failure to

conduct a further inquiry of L.D., either at the time of the jury's deliberations or following the jury's verdict, but rather the court's denial of the defendant's motion for a mistrial *based on its failure to conduct a further inquiry of L.D.* at the time of trial. Because we are unable to review a ruling that does not exist, we will limit our review to the court's denial of the motion for a mistrial.

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . .

"In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 628, 175 A.3d 514 (2018).

We discussed the circumstances surrounding L.D.'s note in part I of this opinion. This includes the fact that Glomb was present during the proceeding on behalf of the defendant on November 13, 2015. We now set forth more fully the colloquy that transpired between the court, the prosecutor, and Glomb after the court received the note:

"The Court: Good afternoon. We've received some notes from the jury. The first is court exhibit 28, and it was received from one of the jurors, [L.D.] and I have shared it with both sides. Does either side want to canvass [L.D.] before we go any further?

"[The Prosecutor]: No, Your Honor.

"[Defense Counsel]: No, Your Honor.

"The Court: Both parties have indicated that they don't see a need to canvass [L.D.], so we won't do that at this point.

"Then, we've also received another note from the jury, it's been marked as court exhibit 30, and it indicates that, we have the verdict on all counts, one through five.

"Anything before we bring the jury in?

"[The Prosecutor]: No, Your Honor.

"[Defense Counsel:] No, Your Honor."

The foregoing colloquy reflects that Glomb waived any claim that the court failed to conduct a further inquiry of L.D. on November 13, 2015. "The mechanism by which a right may be waived . . . varies according to the right at stake. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009).

The state urges us to conclude that defense counsel waived any claim that the court should have granted his motion for a mistrial on the basis of L.D.'s note. We disagree. At trial, the defendant waived any claim that the court failed to canvass L.D. at the time it received her note. In exercising its discretion on the motion for a mistrial, however, the court was obliged to determine whether, in light of the trial proceedings as a whole, the defendant received a fair trial. Given that defense counsel, in his role at trial, had an immediate duty to protect the defendant's rights, the fact that counsel expressly agreed with the court's response to L.D.'s note undoubtedly was compelling evidence that the defendant's right to a fair trial had not been violated. Yet, having been presented with the motion for a mistrial on the basis of L.D.'s note, the court could well have decided upon its consideration of all the proceedings over which it had presided, including events that transpired after it had received L.D.'s note, that despite defense counsel's waiver, the defendant was entitled to a new trial on the basis of the note. Thus, in connection with the present claim, we interpret the effect of the waiver more narrowly than does the state.

As we have discussed in part I of this opinion, L.D.'s note appears to have memorialized the fact that L.D. felt "attacked" as a juror but, following the court's Chip Smith instruction, she was ready and willing to continue to deliberate with her fellow jurors. Importantly, L.D. thanked the court for providing the jury with additional guidance and did not make any request of the court. Therefore, it was reasonable to infer that her note was a strong indication that the court's Chip Smith instruction was effective and that, despite any hostility during deliberations, she was open-minded and ready to continue talking with the other members of the jury. After the court's Chip Smith instruction, the jury deliberated for two additional hours before reaching its verdict. At the

defendant's request, the jurors, including L.D., were polled individually—and, obviously, in the court's presence—and no juror expressed even the slightest reservation or disagreement concerning the verdict announced by the foreperson.

Despite the difficulty experienced by the jury in reaching its verdict, we are mindful that "[t]he alleged demeanor of the jury during its deliberations is not an appropriate basis on which to assess the coercive effect of a jury instruction. More relevant is the manner in which the jurors individually announced their unanimous verdict." (Footnote omitted.) *State* v. *Feliciano*, supra, 256 Conn. 444. The fact that the jury had difficulty reaching a unanimous verdict but, following further instruction and deliberation, was able to reach a unanimous verdict does not in and of itself give rise to a concern that the jury was coerced into reaching its verdict. "Changes of positions by jurors as a consequence of deliberations are an appropriate feature of the deliberative process." *United States* v. *Badolato*, supra, 710 F.2d 1515. In light of the foregoing, we are not persuaded that the court abused its discretion in denying the motion for a mistrial.

### III

Finally, the defendant claims that the court deprived him of his right to due process by failing to provide the jury with additional guidance with respect to the principle of accessorial liability. We disagree.

The following additional facts are relevant to this claim. As we stated previously in this opinion, the state charged the defendant with two counts of murder as a principal or as an accessory in violation of §§ 53a-54a and 53a-8.[15] It does not appear that either party filed requests to charge. On November 3, 2015, two days prior to delivering its jury charge, the court provided a copy of its draft jury charge to the parties. Although the court made some further revisions to the instructions pertaining to counts one and two, it suffices to observe that the deficiencies that the defendant now claims to have existed in the court's charge were reflected in the court's proposed charge that it provided to the parties.

On November 4, 2015, the court held a lengthy charging conference during which the prosecutor and defense counsel raised a number of issues concerning specific instructions in the court's proposed charge. With respect to the accessorial liability instruction at issue in the present claim, the prosecutor stated: "The thing I was questioning is the principal versus accessory. So, in the beginning of the murder charge, it says that [the defendant is] charged under the accessory liability statute and . . . it says separate theories of liability, but it's not clear what the other theory [of liability] is. Like, later on in the instruction, it says you

can find him [guilty] as a principal or an accessory, so I was just wondering if there's a way that that could be kind of explained up front." The court stated that it had based its instruction on the standard criminal jury instruction and that it was not inclined to make any change to it. The court noted that although the instruction was "not as clear . . . as you hope it could be," it nonetheless believed that it was "an accurate statement of the law." Defense counsel did not raise any objection to this portion of the court's charge. Thereafter, after the court made additional revisions to its proposed charge on the basis of its conversations with the parties, the court provided the parties with revised instructions. After reviewing the revised instructions, neither the prosecutor nor defense counsel raised any additional objection to the court's murder instruction. At the conclusion of the charging conference, defense counsel noted that he had "[j]ust one final point" to make with respect to the court's cooperating witness instruction, noting that it was his "only thing . . . [his] exception" to the charge.

In its jury charge, the court instructed the jury with respect to the essential elements of the murder charges and with respect to principles of accessorial liability.[16]

As we stated previously in this opinion, on November 12, 2015, the fifth day of the jury's deliberations, the court received a note from the jury, stating: "Could we please have clarification or the definition of the accessory liability statute? And the separate theories of liability. Bottom pg. 25."[17] Outside of the presence of the jury, the court shared the contents of the jury's note with the prosecutor and defense counsel, and stated: "What I would propose is that we bring the jury in and . . . tell them that we received the note, and we need them to be more specific as to what they're asking. Because I think this is basically a very general request and it's hard to know . . . how to answer it otherwise. Is that agreeable?" The prosecutor stated: "Yes, sir." Defense counsel stated: "Yes."

In the presence of the jury, the court read the note aloud and stated in relevant part: "I've had a chance to consult with the attorneys regarding the note, and at this point we're not sure what you're asking exactly. So, we would ask that you think about it some more, and if you can provide us with another note indicating if you have specific questions.

"The jury instructions that were provided are considered the jury instructions for accessory liability. So, that's the standard criminal jury instructions. So, if you have specific questions regarding the standard criminal jury instructions, if you can put that in a note and then we'll have a better idea as to how to respond. Okay?

"So . . . what I would ask that you do is, if you can return to the jury room, consider that. If you do want

to provide us with another note, do that; otherwise, at about . . . 4:45 or so we're going to have to adjourn until tomorrow.''

After the jury exited the courtroom, the court stated: "What I would suggest is just to wait at this point; we'll just kind of be on standby and hopefully get a note back from the jury." Thereafter, the jury did not provide the court with another note concerning the instruction at issue, neither the prosecutor nor defense counsel asked the court to take any further action with respect to the note, and the court did not sua sponte take any further action with respect to the note.[18]

For the first time on appeal, the defendant claims that the court's response to the jury's note denied him his right to due process and created a reasonable possibility that the jury was misled about the state's burden of proof. The defendant correctly acknowledges that this claim is unpreserved. He seeks review under the bypass doctrine set forth in *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine. See Practice Book § 60-5.

The state asserts, and we agree, that the defendant waived any claim of error regarding the court's response to the jury's note. "[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Grasso*, 189 Conn. App. 186, 225–26, 207 A.3d 33, cert. denied, 331 Conn. 928, 207 A.3d 519 (2019).

This court addressed a procedurally similar issue in *Grasso*, in which the defendant claimed that, during jury deliberations, the trial court had not adequately responded to a jury note, thereby violating her right to due process and her right to the effective assistance of counsel. Id., 222. This court concluded that, at trial, the defendant waived the constitutional claim raised on appeal because defense counsel had not merely failed

to object to the trial court's response, but had expressly stated to the trial court that he did not object to the court's responding to the note in the manner that it did. Id., 223. This court stated that "[p]ermitting the defendant now to object to the court's proposed response, after defense counsel acquiesced in it at the time of trial, would constitute an ambuscade of the trial court." Id., 227. The waiver analysis set forth in *Grasso* applies to the claim at issue in the present case, as well.

Having concluded that the claim was waived, we likewise conclude that the defendant is unable to prevail under *Golding*.[19] "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 448–49, 988 A.2d 167 (2009); see also *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009); *State* v. *Frazier*, 181 Conn. App. 1, 36, 185 A.3d 621, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

To the extent that the defendant seeks reversal under the plain error doctrine,[20] we are not persuaded that plain error exists. Generally, "[t]his court has adhered to the view that waiver thwarts a finding that plain error exists." *State* v. *Bialowas*, 160 Conn. App. 417, 430, 125 A.3d 642 (2015), remanded, 325 Conn. 917, 163 A.3d 1204 (2017). Nonetheless, our Supreme Court has observed that "there appears to be some tension in our appellate case law as to whether reversal on the basis of plain error could be available in cases where the alleged error is causally connected to the defendant's own behavior." *State* v. *Darryl W.*, 303 Conn. 353, 371–72 n.17, 33 A.3d 239 (2012); see also *State* v. *McClain*, 324 Conn. 802, 805, 812, 155 A.3d 209 (2017) (waiver of claim of instructional error under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 [2011], does not "necessarily foreclose" or "preclude" reviewing court from affording relief under plain error doctrine).

Even if we assume that consideration of plain error is proper, the defendant has not demonstrated that plain error exists. "If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions necessary to respond properly to the request or to direct the jury's attention to a portion of the original instructions." Practice Book § 42-27; see also *State* v. *Fletcher*, 207 Conn. 191, 193, 540 A.3d 370 (1988). Logically, the court's obligation in this regard is limited by its ability to understand the jury's request. The facts at issue are not in dispute. The court received a note in which the jury asked for "clarification or the definition of the acces-

sory liability statute . . . [a]nd the separate theories of liability." We agree with the court that this request is not a model of clarity. The court did not, however, disregard the note due to its lack of clarity. Instead, it proposed asking for further clarification from the jury, which had a considerable track record of communicating with the court by means of written notes. After counsel agreed with this reasonable course of action, the court informed the jury that it had provided it with the standard criminal jury instruction, and asked the jury to spend some more time thinking about the issue and to provide it with any specific questions that it had about the instruction. The court did not reiterate its prior instruction, a written copy of which the jury already had in its possession, or attempt to clarify its prior instruction because, as it indicated, the jury had not yet set forth with specificity questions that it had about the instruction. The court's appropriate response was to ask the jury to be more specific in terms of what, if anything, it did not understand. The court encouraged the jury to seek whatever further guidance it deemed necessary and, absent any indication to the contrary, we presume that the jury followed the court's instructions and did not have need of further guidance. See, e.g., *State* v. *Helmedach*, 125 Conn. App. 125, 136–37, 8 A.3d 514 (2010), aff'd, 306 Conn. 61, 48 A.3d 664 (2012).

In light of the foregoing facts, we conclude that, with respect to the manner in which the court responded to the jury's note, the defendant has failed to demonstrate the existence of an error that is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.

We also observe that, in the context of challenging the court's response to the jury's note concerning accessorial liability, the defendant appears to raise a distinct challenge to the court's charge with respect to accessorial liability. Specifically, the defendant argues that "[t]he state did not, in the information or summation, articulate for the jury (or for [the] defendant or the court) its theory of what constituted intentional aid in the murders. The court did not mention any facts or specify any alleged act in its accessory charge. The jury was left to determine without guidance how the law was to be applied to this evidence."

To the extent that the defendant challenges the court's instructions under *Golding*, the claim of instructional error fails under *Golding*'s third prong because the defendant impliedly waived any objection to the instructions under the rule set forth in *State* v. *Kitchens*, supra, 299 Conn. 482–83. In *Kitchens*, our Supreme Court concluded that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modi-

fications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id. As our discussion of the relevant procedural history reflects, the court provided counsel with a copy of its proposed jury instructions, including its instructions on the murder counts, allowed a meaningful opportunity for review of its instructions, solicited comments from counsel, and defense counsel affirmatively stated that the defendant's only exceptions concerned other portions of the charge. Moreover, after the jury sent its note to the court with respect to the accessorial liability instruction, defense counsel, Brown, indicated in relevant part that, if the jury sought further guidance with respect to the instruction in his absence on November 13, 2015, he did not object to the court simply reiterating the instruction that it had provided to the jury in its charge. Brown specifically stated that "further instruction" was unnecessary in light of the evidence. See footnote 18 of this opinion. On this record, we conclude that the defendant implicitly waived any claim of error related to the court's jury instruction concerning accessorial liability.

Finally, in light of the defendant's invocation of the plain error doctrine, we consider whether the court's accessorial liability instruction reflects plain error.[21] The defendant argues in relevant part: "The instructions in this case had to provide sufficient guidance on the law to convey to the jury what [the] state had to prove beyond a reasonable doubt and to allow the jury to apply the law to the facts in order to prove accessorial liability. When the jury asked for additional guidance during deliberations, the court erred in failing to provide it. Without any theory articulated as to what conduct allegedly aided in the murders, or more specifically, what conduct [the] defendant perpetrated with the intent to aid and that did aid in the commission of murder, the jurors were left to create their own theories about what [the] defendant could have done to aid in the murders. Under the circumstances, it is reasonably possible that the jury resorted to speculation, failed to understand that [the] defendant had to have the intent to kill, failed to connect whatever action it decided that [the] defendant took with intent to kill at the time of the shooting, or accepted the state's invitation to assume intent to kill based on the earlier robbery, gang affiliation and presence [at the scene of the shooting]."

The defendant also argues in relevant part: "The only evidence of any act on the defendant's part was [his] setting up the meeting on Benton Street, asking Rodrick to take [Quintero and Burgos] to their homes [following the shooting], and [his] taking home [Rodriguez'] cell phone . . . . The jury needed to understand that it had to find that when [the] defendant set up the meeting,

he did so with [the] intent to kill the victims. An exchange gone wrong, or an encounter turned sour, would not suffice. Alternatively, the jury needed to understand that it had to find that any acts that occurred after the shooting were conducted because [the] defendant had the intent to kill and [that he] committed those acts to aid in the commission of the murders at the time [that] the murders occurred. The temporal nexus is never mentioned at all in the accessory instruction, and [the] 'intent to kill' is never explicitly mentioned, either. . . . Rather, the court repeatedly used the phrase, 'acting with the mental state required for commission of murder,' and left the jury to understand that the intent to kill is the mental state required for murder. The jurors could have understood the proximate cause instruction to find that if the defendant robbed the victims or set up the meeting on Benton [Street], and either of those incidents led to the shooting and the victims' deaths, then [the] defendant is responsible even if he did not intend for the deaths to occur."

Essentially, the defendant's claim of plain error relates to what he views as the court's failure to marshal the evidence such that the jury was made aware of what evidence, if any, the state relied on to demonstrate that he had intentionally aided one or more other persons in connection with the victims' murders. This argument is advanced on appeal despite the fact that, at trial, defense counsel voiced his agreement with the instruction delivered in the court's charge and argued that, on the basis of the evidence, "further instruction" was unnecessary. See footnote 18 of this opinion. The defendant asserts that, during argument, the prosecutor failed to provide the jury with any evidentiary theory of accessory liability, as well. Although the defendant's argument is based on the premise that the "only evidence" on which the jury might have relied in finding guilt as an accessory consisted of his arranging the meeting with the victims, asking Rodrick to drive Quintero and Burgos home following the shooting, and his possession of Rodriguez' gun, there was compelling evidence of the defendant's statements to others following the shooting. These statements reflected that the defendant was present at the scene of the shooting, had participated in the shooting, and believed that he was responsible for the victims' deaths.

During the state's closing argument, the prosecutor discussed the evidence surrounding the meeting between the victims, the defendant, Quintero, and Burgos. The argument focused on the fact that the defendant, Burgos, and Quintero, were gang members and that, on the night of the shootings, they were attempting to prohibit Rodriguez from selling drugs in territory controlled by their gang. Also, the prosecutor drew the jury's attention to the evidence that, after the defendant physically struck Rodriguez, and deprived him of his gun and cell phone, the defendant, joined

by Quintero and Burgos, all of whom were armed, returned to the scene of the shooting to meet with Rodriguez.

There was evidence that three guns were used in the shootings, including a nine millimeter handgun, a .22 caliber handgun, and a shotgun. There was evidence that the victims were struck with nine millimeter bullets and .22 caliber bullets. The evidence was not conclusive, however, with respect to whether the defendant, Quintero, or Burgos had fired the fatal gunshots. On the basis of the evidence, the prosecutor argued in relevant part: "There's no need for all of you to agree as to whose gun fired the fatal shot or shots to other victims when a person's charged like this. The fact that you have three men armed with a nine millimeter, a .22 caliber, and shotgun shooting at two unarmed, defenseless people at least nineteen times and kill[ing] them with many of those bullets shows that these three individuals intentionally aided each other in the murders of . . . Rodriguez and . . . Franqui."[22]

Although there may have been evidence of other conduct by the defendant that intentionally aided others in the commission of the murders, the court, like the prosecutor, appears to have drawn the jury's attention not only to the evidence supporting a finding that the defendant was an armed participant in the shootings, but to the fact that the evidence was not conclusive with respect to whether he had actually fired a fatal gunshot. The court stated: "Where it cannot be determined who fired the fatal shot, beyond a reasonable doubt, the element of murder as to who caused the death has not been proved beyond a reasonable doubt. However, persons acting with the mental state required for the commission of murder, who intentionally aid one another to engage in such conduct and cause the death, are accessories to one another, and would be criminally liable for such conduct as accessories to murder." See id.

On this record, we are not persuaded that there was the possibility of any confusion in the minds of the jurors with respect to what evidence the state relied on in support of the murder counts. Moreover, we are not persuaded that there was the possibility of any confusion in the minds of the jurors with respect to the requisite mental state required for the commission of murder as an accessory. The court repeatedly instructed the jury that it must find that, if the defendant intentionally aided others in the commission of the crime of murder, the defendant had acted with the mental state necessary for the commission of murder. The court clearly instructed the jury that this mental state consisted of the intent to kill another person. See footnote 16 of this opinion.

With respect to the accessorial liability instruction, the defendant has failed to demonstrate the existence

of an instructional error that is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury found the defendant not guilty of one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, and one count of criminal possession of a firearm in violation of § 53a-217. The court imposed a total effective sentence of eighty years of incarceration.

[2] During the first few days of jury selection, the court informed potential jurors, including three persons who were chosen to serve on the jury, that it expected the trial to commence on October 22, 2015, and be completed by November 6, 2015. During the later days of jury selection, the court informed potential jurors, including nine persons who were ultimately chosen to serve on the jury, that it expected the trial to commence on October 26, 2015, and be completed by November 13, 2015. At no time did the court state to potential jurors that its anticipated trial schedule was not subject to change.

[3] The trial did not resume on November 11, 2015, because the Veterans Day holiday was observed that day.

[4] In this opinion, we will refer to individual jurors by their initials to protect their legitimate privacy interests.

[5] On November 10, 2015, Brown reminded the court outside of the jury's presence that, due to a family medical matter that required him to travel out of the state, he would be unable to be present in court on November 13, 2015. Brown stated that he planned on having Glomb attend the trial in his absence and that he preferred to have an opportunity to weigh in on any substantive issues that might arise during his absence from the trial. The court said that it would attempt to accommodate Brown.

On November 12, 2015, the court revisited the issue of Brown's absence. Brown explained that Glomb would attend the trial on November 13, 2015, and that, due to Brown's travel plans, Glomb could reach him if necessary by phone no earlier than 11:30 a.m. on November 13, 2015. The court stated that it planned to have the jury resume its deliberations at 10:30 a.m. on November 13, 2015. The court stated that if it received a note from the jury between 10:30 a.m. and 11:30 a.m. in which it either stated that it had reached a verdict or requested to hear additional playback, the court would take action with respect to such notes without affording Glomb an opportunity to consult with Brown. The court also stated that it would be helpful for Brown to consult with Glomb with respect to its accessorial liability instruction so that, if it received an additional note from the jury related to the instruction, Glomb would be "kind of up to speed on the instruction . . . ." The court stated, however, that Glomb would have the opportunity to consult with Brown if he desired to do so. The court stated that if, during this brief period of time, it received "any other notes" from the jury, it would delay the proceeding if Glomb wanted an opportunity to consult with Brown. The court stated that "if there's any other notes that come up . . . that Attorney Glomb doesn't feel comfortable addressing, then we'll wait until he can reach you by phone." The court, however, asked Brown to prepare Glomb for the possibility of a verdict during his absence. Brown replied: "Yeah. Yeah. That's fine. It is what it is."

At the end of the proceeding on November 12, 2015, at Brown's request, the court alerted the jury to the fact that Brown would not be present on November 13, 2015, due to "family responsibilities." The court informed the jury that Glomb would "be here" in Brown's absence.

[6] The note sent by D.N. states in relevant part: "I . . . will not be able to continue with Jury Service beyond this Friday [November 13, 2015].

"While I have been in attendance, my mother who lives in Chandler, AZ, has had two emergency surgeries to address Breast Cancer. Monday [November 16, 2015] she has to start high dose radiation treatments [two times] daily. I have booked a flight this weekend to arrive in Arizona to care for her during her treatment.

"I apologize for the inconvenience to the court, defendant, and the co-jurors. However, I do not intend to be back for continuing deliberations next week."

[7] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity." (Internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 51 n.2,

801 A.2d 730 (2002).

[8] Pursuant to *Golding*, a defendant may prevail on a claim of constitutional error not preserved at trial only if all four of the following conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding* by eliminating word "clearly" before words "exists" and "deprived").

[9] "[T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [Previously], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017). "It is clear that an appellate court addressing an appellant's plain error claim *must* engage in a review of the trial court's actions and, upon finding a patent error, determine whether the grievousness of that error qualifies for the invocation of the plain error doctrine and the automatic reversal that accompanies it." (Emphasis in original.) *State* v. *Myers*, 290 Conn. 278, 288–89, 963 A.2d 11 (2009).

[10] We observe that the defendant does not claim that the court coerced the jury to reach a verdict of guilt.

[11] With respect to the notes sent by the jury on November 13, 2015, the defendant states in his appellate brief: "Although the notes came during the period when Attorney Brown was not available, the court did not delay in deciding to give the Chip Smith instruction, both orally and in writing." (Internal quotation marks omitted.) The defendant, however, has not raised a claim of error in this regard. As we have observed previously in this opinion, Brown informed the court that Glomb would be present on November 13, 2015, and the court made clear to Brown that, in Brown's absence, it would afford Glomb an opportunity to consult with Brown if Glomb wanted to do so. See footnote 5 of this opinion. The record reflects that, after the court proposed responding to the jury's deadlock note by providing the jury with a Chip Smith instruction, Glomb did not ask for an opportunity to consult with Brown, but merely stated that he did not have an objection to the court's proposal.

[12] The state argues that the mixed verdict returned by the jury further supports a finding that the jury was not coerced. The state properly observes that, in rejecting claims involving prosecutorial impropriety and evidentiary error, Connecticut courts, in concluding that it was not likely that prosecutorial impropriety or evidentiary error affected the jury's verdict, have relied on the fact that the jury had reached a mixed verdict. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 618, 854 A.2d 718 (2004) (mixed verdict proof that prosecutor's improper argument did not affect verdict), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *Gallo*, 135 Conn. App. 438, 461–62, 41 A.3d 1183 (2012) (mixed verdict proof that defendant not harmed by improper admission of evidence), appeal dismissed, 310 Conn. 602, 78 A.3d 854 (2013) (certification improvidently granted). A mixed verdict helps to shed light on the prejudicial effect, if any, of prosecutorial impropriety or the improper admission of evidence because a not guilty verdict on *any* charges against a defendant reflects that the argument or evidence at issue did not so unfairly pervade the jury's deliberations that it affected the jury's deliberations as a whole.

In the context of a coerciveness claim, however, a reviewing court reasonably could interpret a mixed verdict as evidence that the jury simply felt pressure to reach a verdict and, thus, found the defendant guilty on some counts but not others simply to conclude the deliberations. In other words, in the context of a coerciveness claim, a verdict of not guilty with respect to one or more counts does not necessarily shed light on the source of the

jury's disagreement or whether the verdict of one or more jurors was the result of coercion rather than conscience. See, e.g., *Phelps* v. *Smith*, 517 Fed. Appx. 379, 384 (6th Cir. 2013) (declining to apply mixed verdicts rationale in context of claim of jury coercion).

[13] In light of our analysis under *Golding*, including our determination that the defendant has not demonstrated that the court coerced the jury into reaching its verdict, we conclude that the defendant has failed to demonstrate that plain error exists in connection with the present claim.

[14] The letter stated in relevant part: "I am writing this missive in regards to a situation that has taken place before you in the matter of my trial. I am sure you are aware of it because my counsel has now put it into the attention of all involved. I ask that you as the leader of your courtroom put my verdict aside and put me, my counsel, State Attorney and the (2) jurors whom were intimidated in your presence to get this right. My counsel is to put the proper motions before you before my sentencing date on [February 4, 2016]. I ask that you give me the authorization to put my motions in a timely manner in case he does not because he tells me he is overwhelmed with other cases. Thank you for your consideration."

[15] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[16] The court instructed the jury in relevant part: "The defendant is charged in count one with the murder of Leida Franqui. The state has charged the defendant under the accessory liability statute. This statute does not define a separate crime, but separate theories of liability.

"The statute defining the offense of murder reads in pertinent part as follows:

"A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: (1) the defendant intended to cause the death of another person, and (2) in accordance with that intent, the defendant caused the death of Leida Franqui by discharge of a firearm.

"The first element is that the defendant specifically intended to cause the death of another person. There is no particular length of time necessary for the defendant to have formed the specific intent to kill. A person acts intentionally with respect to a result when his conscious objective is to cause such result.

"The concept of specific intent applies to the offense of murder. Please refer to the instructions on specific intent and evidence of intent.

"The intent to cause death may be inferred from circumstantial evidence. The type and number of wounds inflicted, as well as the instrument used, may be considered as evidence of the perpetrator's intent, and from such evidence an inference may be drawn that there was intent to cause a death. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by you upon consideration of these and other circumstances in the case in accordance with my previous instructions.

"Declarations and conduct of the accused before or after the infliction of wounds may be considered if you find they tend to show the defendant's intent. This inference is not a necessary one; that is, you are not required to infer intent from the defendant's alleged conduct, but it is an inference you may draw if you find it reasonable and logical and in accordance with my instructions on circumstantial evidence.

"The second element is that the defendant, acting with the intent to cause the death of another person, caused the death of Leida Franqui by discharge of a firearm.

"This means that the defendant's conduct was the proximate cause of the decedent's death. You must find it proved beyond a reasonable doubt that Leida Franqui died as a result of the actions of the defendant. Please refer to the instruction on proximate cause and firearm.

"In this case, the defendant is charged under the accessorial liability statute. The statute does not define a separate crime, but a separate theory of liability.

"A person is criminally liable for a criminal act if he directly commits it or if he is an accessory in the criminal act of another. The statute defining accessory liability reads in pertinent part as follows:

"A person, acting with the mental state required for the commission of

an offense, who intentionally aids another person to engage in conduct which constitutes an offense, shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"A person is an accessory if he intentionally aids another person to engage in conduct that constitutes an offense. Aid means to assist, help or support. A person acts intentionally with respect to a result when his conscious objective is to cause such result. Intentionally aid, therefore, means to act in any manner, the conscious objective of which is to assist, help or support. Please refer to the instructions on specific intent and evidence of intent.

"If the defendant intentionally aided as specified in the statute, he is guilty of murder as though he had directly committed it or participated in its commission. To establish the guilt of a defendant as an accessory for assisting in the criminal act of another, the state must prove criminality of intent and community of individual purpose. That is, for the defendant to be guilty as an accessory, it must be established that he acted with the mental state necessary to commit murder, and that in furtherance of that crime, he intentionally aided the principal to commit murder.

"Evidence of mere presence as an inactive companion, or passive acquaintance, or the doing of innocent acts, which, in fact, aid in the commission of a crime, is insufficient to find the defendant guilty as an accessory under the statute. Nevertheless, it is not necessary to prove that the defendant was actually present or actively participated in the actual commission of the crime of murder.

"Where it cannot be determined who fired the fatal shot, beyond a reasonable doubt, the element of murder as to who caused the death has not been proved beyond a reasonable doubt. However, persons acting with the mental state required for the commission of murder, who intentionally aid one another to engage in such conduct and cause the death, are accessories to one another, and would be criminally liable for such conduct as accessories to murder.

"For you to find the defendant guilty of this charge, you must unanimously find that the state has proved all the elements of murder beyond a reasonable doubt. If you conclude that the defendant is guilty as a principal or as an accessory, you do not need to be unanimous regarding whether you believe he was a principal or accessory as long as all twelve jurors agree that at least one method (i.e., principal or accessory) has been proved beyond a reasonable doubt.

"If you find that the state has proved beyond a reasonable doubt each of the elements of the crime of murder, then you shall find the defendant guilty of murder.

"On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements, you shall then find the defendant not guilty of murder.

"The defendant is charged in count two with the murder of Luis Rodriguez.

"The state has charged the defendant under the accessory liability statute. I have already defined for you the crime and all the elements of murder. I refer to the instruction on murder, and that instruction applies equally here.

"In summary, the state must prove beyond a reasonable doubt that (1) the defendant intended to cause the death of another person, and (2) in accordance with that intent, the defendant caused the death of Luis Rodriguez by means of a discharge of a firearm.

"In addition, I have already instructed you on the accessory liability statute. I refer you to the instruction on accessory liability, and that instruction applies equally here.

"For you to find the defendant guilty of this charge, you must unanimously find that the state has proved all the elements of murder beyond a reasonable doubt. If you conclude that the defendant is guilty as principal or as an accessory, you do not need to be unanimous regarding whether you believe he was a principal or accessory as long as all twelve jurors agree that at least one method (i.e., principal or accessory) has been proved beyond a reasonable doubt.

"If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of murder, then you shall find the defendant guilty of murder.

"On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements, you shall then find the defendant not guilty of murder."

[17] The court's instruction for count one began on page twenty-five of its charge.

[18] As we discussed previously in this opinion, after the jury exited the

courtroom, the court addressed defense counsel, Brown, with respect to the issue of his anticipated absence from the trial on the following day, Friday, November 13, 2015. The court asked Brown to prepare his associate, Glomb, for the possibility that, in his absence, the jury might seek more guidance with respect to the accessorial liability instruction. Without objecting to the manner in which the court had responded to the jury's note earlier that afternoon, Brown stated that he "would just have . . . an objection to any further instruction at this point because I don't think that there's any evidence of [the defendant] providing a firearm to the actor or testimony or any argument to that point. I mean, *as far as just repeating the instructions, obviously, I don't have any problem with that*." (Emphasis added.) The court replied that, without knowing what questions the jury might present, it was not sure if any further instructions, beyond those already provided to the jury, would be necessary.

[19] See footnote 8 of this opinion.

[20] See footnote 9 of this opinion.

[21] Although we review this claim for plain error, we are mindful that the defendant's claim concerns not merely whether the court misled the jury by failing to marshal the evidence sufficiently, such that the jury was left to speculate about the evidence that could have constituted proof beyond a reasonable doubt of his guilt as an accessory, but that it likely misled the jury with respect to the mental state required for the commission of the crime of murder as an accessory. Our consideration of whether plain error exists is informed by well established principles.

"A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . .

"On review, we do not evaluate the court's marshaling of the evidence in isolation. Rather, [t]o determine whether the court's instructions were improper, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Dixon*, 62 Conn. App. 643, 647–48, 772 A.2d 166 (2001).

"A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 288–89, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

[22] There was evidence that the police recovered nine millimeter shell casings, a .22 caliber bullet fragment, and two live shotgun rounds from the shooting scene. Moreover, there was evidence that the victims died as a result of multiple gunshot wounds, which included gunshots fired at their heads. Medical examiners subsequently recovered nine millimeter and .22 caliber bullet fragments from the victims' bodies. The defendant argues that there was no evidence, however, to support the state's theory that either the defendant, Quintero, or Burgos was armed with a shotgun or had used a shotgun.

The state's theory of the case, which was that all three men were armed

and had either used or attempted to use a firearm during the shooting, was reasonably based on the presence of the nine millimeter and .22 caliber bullet fragments recovered from the victims' bodies, as well as the presence of the live shotgun rounds found near the victims. The evidence permitted the jury to infer, as well, that someone had attempted to fire the live shotgun rounds, without success. In any event, the present claim does not require us to consider whether the state's evidentiary theory was supported by the evidence. Instead, in resolving the present claim, we must consider whether, as the defendant argues, neither the prosecutor nor the court set forth a theory of liability that was based on the alleged facts of the state's case.

———————————————————